# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STANLEY WAYNE MCBEE,

      Plaintiff,

vs.                                        No. CIV 01-1313 JP/LCS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

      **THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse or Remand (Doc. 6), filed May 20, 2002. The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits. The United States Magistrate Judge, having considered the Motion, memoranda, administrative record, and applicable law, finds that the motion is well-taken and recommends that it be **GRANTED IN PART AND THAT THIS CASE BE REMANDED**.

## PROPOSED FINDINGS

      1.      Plaintiff, now fifty-seven years old, filed his current application for disability insurance benefits on February 5, 1999, alleging disability since November 12, 1976, due to back problems. (R. at 95-97.) He has an eleventh grade education and a GED, with past relevant work as retail clerk and route driver/salesman. (R. at 29; 137.) Plaintiff was forty-two years old on March 31, 1988, the date his disability insured status expired. (R. at 12; 95.)

2.     Plaintiff's application for disability insurance benefits was denied at the initial level on April 22, 1999, (R. at 77-78), and at the reconsideration level on June 14, 1999. (R. at 79-80.) Plaintiff appealed the denial of his application by filing a Request for Hearing by Administrative Law Judge (ALJ) on August 9, 1999. (R. at 91-92.) The ALJ held a hearing on January 13, 2000, at which Plaintiff appeared and was represented by counsel. (R. at 21; 23.) Plaintiff and his spouse testified at the hearing. (R. at 21.)

3.     The ALJ issued his decision on June 15, 2000, analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993). (R. at 12-17.) The ALJ determined that Plaintiff met the disability insured status requirements through March 31, 1988. (R. at 12.) At the first step of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (R. at 13.) At step two, the ALJ determined that Plaintiff had the severe impairments of status post laminectomy at L4-5 and chronic back pain. (R. at 14.) At step three, the ALJ found that the severity of Plaintiff's impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599. (*Id.*) The ALJ then determined that Plaintiff retained the residual functional capacity (RFC) for the full range of light work. (R. at 14.) At step four, the ALJ determined that Plaintiff's RFC was insufficient to perform his past relevant work. (R. at 15.) At step five, relying on the Medical-Vocational Guidelines[1] (Grids), the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 15-16.)

4.     On July13, 2000, Plaintiff filed a request for review of the ALJ's decision. (R. at 6-8.)

---

[1] 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2).

On October 3, 2001, the Appeals Council denied the request for review. (R. at 4-5; 192-193.) Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. On November 20, 2001, Plaintiff filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

**Standard of Review**

5.      The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Sec'y of Health and Human Servs.,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Sec'y of Health and Human Servs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (citation omitted)). A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

6.      In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months that prevents the claimant from engaging in substantial gainful activity. *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993) (*citing* 42 U.S.C. § 423(d)(1)(A)). The Commissioner has established a five-step sequential evaluation process to aid in the disability determination. 20 C.F.R. § 404.1520. At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations

under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

**Administrative Record**

7.      In January 1976, Plaintiff injured his back while pulling a loaded dolly up some stairs while working as a liquor delivery route driver. (R. at 30; 97; 137; 141.) Plaintiff continued working despite back pain and spasms until November of 1976. (R. at 137.) A December 1976 myelogram indicated an herniated at L4-L5 on the left. (*Id.*) On January 20, 1977, Plaintiff underwent a laminectomy. (R. at 137; 141.) Although Plaintiff experienced some relief, the pain continued. (R. at 141.)

8.      In November 1977, Dr. Ronald Racca, M.D. reported that Plaintiff's back spasms would make it difficult for Plaintiff to stand or sit for long periods of time. (R. at 137; 140.) Beginning in January 1978, Plaintiff attempted to complete an accounting program at the Technical Vocational Institute in Albuquerque, but missed several days of classes due to back pain. (R. at 137.) On March 3, 1978, a second myelogram showed a slight circumferential constriction at L4-L5, but no true evidence of a herniated disk. (R. at 141.) Dr. Morgan recommended a second operation, but Plaintiff elected to postpone the operation until after the semester ended. (R. at 137.) Plaintiff was able to attend classes on a modified scheduled that allowed him rest breaks. (*Id.*)

9.      On November 27, 1978, ALJ John F. Loehr awarded Plaintiff disability insurance benefits as of November 12, 1976. (R. at 136.) ALJ Loehr found Plaintiff credible based on Plaintiff's "forthright attitude, sincere demeanor, and responsive conduct in giving his testimony at

the hearing." (R. at 137-138.)

10.     On July 11, 1980, Dr. Federico Mora, M.D. examined Plaintiff and wrote that Plaintiff's symptoms were primarily discomfort in the low back, present all the time and aggravated by sitting, standing, or walking long periods of time. (R. at 142.)  Dr. Mora noted that Plaintiff did a lot of walking to keep himself in shape and was otherwise in good health. (*Id*.)  Plaintiff had quit the accounting program due to back pain and had no plans to resume his studies.  (*Id*.)  Plaintiff did not want to have any additional surgery because some of his friends had experienced negative outcomes from back surgery. (*Id*.)

11.     On examination, Dr. Mora found a restricted range of motion with pain, symmetric reflexes, and no sensory changes.  (R. at 142.)  X-rays revealed the surgical defect, anterior osteophyte development at L3-L4, and considerable motion during flexion and extension. (*Id*.)  Dr. Mora opined that Plaintiff had a "failed laminectomy" that had "insufficiently restored him to a degree of functional capacity compatible with his education."  (*Id*.)  Dr. Mora opined that, in the best case scenario, Plaintiff was limited to sedentary work, but that Plaintiff might not be able to function in a  sedentary capacity. (R. at 142-143.)  Dr. Mora rated Plaintiff's whole body impairment at 25%. (R. at 143.)

12.     On December 16, 1982, Dr. Gary Singer, M.D. performed a disability evaluation.  (R. at 144.)  Dr. Singer noted that Plaintiff's symptoms consisted of non-radiating low back pain with occasional intermittent left leg discomfort above the knee, no weakness, and posterior numbness on the left thigh.  (*Id*.)  Plaintiff was taking Percodan for pain relief.  (*Id*.)  The pain was aggravated by coughing, sneezing, the weather, bending, and lifting. (*Id*.)  Plaintiff was limited to sitting or standing for ten to twelve minutes and could walk five blocks.  (*Id*.)

13.     Plaintiff had a slow deliberate gait, overall spinal alignment was within normal limits with low lumbar tenderness to palpitation and bilateral paraspinous muscle spasm, greater on the left than the right. (R. at 145.) Plaintiff had left gluteal tenderness and possibly tenderness along the sciatic pathway. (*Id.*) Range of motion was restricted with difficulty straightening up. (*Id.*) Plaintiff was unable to effectively walk on his heels and toes due to the pain. (*Id.*) Straight leg raising produced low back pain bilaterally. (*Id.*) Dr. Singer noted no motor weakness, intact sensory response, and slight discrepancies of reflexes. (*Id.*) X-rays revealed L3-L4 osteophyte formation anteriorly, residual trace myelographic dye, and residuals of the laminectomy. (*Id.*) Dr. Singer's impression was status post-back injury followed by myelography, confirmed ruptured disc, status post-discectomy, with probable residual nerve root scarring. (*Id.*)

14.     In January 1983, Defendant proposed to terminate Plaintiff's benefits as of March 1983. (R. at 105.) Plaintiff filed a hearing request, but did not appear at a hearing scheduled for August 29, 1983. (*Id.*) Due to an apparent administrative oversight, Defendant continued to pay disability insurance benefits until 1998, when the oversight was discovered. (R. at 105.) In December 1998, Plaintiff's benefits were terminated based on the 1983 determination with no additional process. (R. at 23-24; 105.) Plaintiff filed his instant application for disability insurance benefits on February 5, 1999. (R. at 95-97.)

15.     On April 8, 1983, an evaluator filled out an agency form summarizing some of Plaintiff's medical records, assessing Plaintiff's residual functional capacity, and describing Plaintiff's vocational information. (R. at 154-157.) The agency evaluator stated that Plaintiff's residual functional capacity was limited to lifting twenty pounds occasionally and ten pounds frequently, being able to sit or walk/stand six hours per days and occasionally climb, balance, stoop, kneel, crouch or

crawl. (R. at 156.) The agency evaluator concluded that based on the assessed residual functional capacity and Plaintiff's vocational information, the Plaintiff was not disabled. (R. at 157.)

16.     On September 29, 1994, Bill Atkinson, FNP, saw Plaintiff for viral gastroenteritis with mild dehydration. (R. at 165.) Plaintiff was treated for clinical rib fracture on February 14, 1997. (R. at 163.) On October 28, 1997, Dr. Kathryn Keith, M.D. diagnosed sinus headaches. (R. at 162.) On November 20, 1997, Mr. Atkinson saw Plaintiff for allergic rhinitis. (R. at 161.) Mr. Atkinson noted that Plaintiff was a smoker and that Plaintiff's allergies were aggravated when he shredded hay for his calves. (*Id*.) Bill Atkinson additionally noted that Plaintiff did not take any medication for his chronic neck and back pain, "which is aggravating but not disabling." (*Id*.)

17.     On December 27, 1997, Dr. Grant Serner, M.D. diagnosed Plaintiff with bronchial pneumonia. (R. at 160.) On January 23, 1998, Susan Myers, Licensed Massage Therapist, wrote that she observed strong contractions Plaintiff's back muscles and pronounced trigger points. (R. at 158.) On January 23, 1998, Mr. Atkinson diagnosed increasing back pain with a history of spinal stenosis. (R. at 159.) Mr. Atkinson noted that Plaintiff's social security benefits were undergoing re-evaluation and that Plaintiff had been able to keep his back pain out of his mind and continue with daily activities "up until the last couple of months" when the pain had become constant rather than intermittent and started to interfere with his sleep. (*Id*.) Mr. Atkinson suggested that Plaintiff be evaluated by an orthopedist. (*Id*.)

18.     A February 16, 1999 CT scan revealed protrusion of the disc material to the right posteriorly at L4-5 with loss of clear outline of the thecal sac, protrusion of the disc material to the left posteriorly at the L5-S1 level, possibly impinging on the left L5 nerve rootlet. (R. at 163.)

19.     On March 19, 1999, Dr. Erich P. Marchand, M.D. examined Plaintiff. (R. at 146-147;

7

170-171.)  Dr. Marchand noted that Plaintiff had a chronic back pain problem to which he had adapted by altering his lifestyle.  (R. at 146.)  Plaintiff had avoided prescription medication and treated his condition with hot baths, herbal remedies, and other "local treatments."  (*Id*.)  Plaintiff had been unable to work since his injury.  (*Id*.)  At times his back pain was quite severe with a slow steady progression of symptomology over time.  (*Id*.)  Plaintiff needed to change position several times during Dr. Marchand's interview.  (*Id*.)

20.     Examination revealed scoliosis concave to the right in the lumbar area, tenderness bilaterally in the paraspinous area.  (R. at 146.)  Straight leg raising and knee chest maneuver caused low back pain.  (*Id*.)  Range of motion was markedly restricted.  (*Id*.)  Muscle bulk, strength, and tone was normal in the legs.  (*Id*.)

21.     A CT scan showed evidence of the prior surgery and degenerative disc disease at L4-L5 and L5-S1.  (R. at 146.)  Abnormal tissue at L4-L5 possibly compromised the canal and nerve root.  (*Id*.)  The CT scan readings were consistent with Plaintiff's symptoms.  (*Id*.)  Dr. Marchand believed that Plaintiff's condition was not a surgically correctable problem, but that the pain was probably related to the radiographic dye from the two myelograms. (R. at 146-147.)  Dr. Marchand stated that the radiographic dye was known to cause an inflammatory reaction in the nerves and determined that Plaintiff's symptoms were typical of that phenomenon.  (R. at 147.)  Dr. Marchand opined that Plaintiff was totally and permanently disabled.  (*Id*.)

22.     On April 22, 1999, Dr. Roger L. Smithpeter, M.D., an agency medical consultant, completed a Physical Residual Functional Capacity Assessment form for Plaintiff's disability insurance benefits claim.  (R. at 172-179.)  Dr. Smithpeter never personally examined Plaintiff.  Dr. Smithpeter found that Plaintiff could lift up to twenty pounds occasionally and ten pounds frequently, could stand

or walk for about six hours in an eight hour workday, could sit about six hours of an eight hour work day, and had an unlimited ability to push and pull. (R. at 173.)

23.     Dr. Smithpeter found it significant that Plaintiff had "virtually no treatments [sic] records" from the time he was terminated from benefits in 1983 to 1988, the date he was last insured. (R. at 173.) Dr. Smithpeter stated that "it is felt" that Plaintiff could do light work duties. (*Id*.) Dr. Smithpeter observed that during the time period 1983 through 1988, Plaintiff moved three times, once to Tennessee, remarried and had a child. (R. at 173-174.) Dr. Smithpeter reasoned that "considering his full daily activities and lack of medical treatment it can be assumed that his back condition was not significantly disabling and that he could do at least light work." (R. at 174.) On June 14, 1999, Dr. Melvin L. Golish, M.D. concurred with Dr. Smithpeter's findings.

24.     Also on April 22, 1999, Dr. Smithpeter completed a second Physical Residual Functional Capacity Assessment, this one for Plaintiff's supplemental security income claim. (R. at 180-187.) In the second assessment, Dr. Smithpeter found that Plaintiff could lift up to ten pounds occasionally and ten pounds frequently, could stand or walk for less than two hours in an eight hour workday, could sit about six hours of an eight hour work day, and had an unlimited ability to push and pull. (R. at 181.)

25.     In his supplemental security evaluation, but not his disability insurance benefits evaluation, Dr. Smithpeter found it significant that Dr. Marchand had found that Plaintiff's pain problem was related to the radiological dye that he was exposed to twice, that the dye was known to cause such symptoms, that Plaintiff's symptoms were fairly typical of the phenomenon, and that the condition was not surgically correctable. (R. at 182.) On June 14, 1999, Dr. Melvin L. Golish, M.D. concurred with Dr. Smithpeter's findings. (R. at 187.)

26.     On August 28, 1999, Dr. Marchand wrote that the most likely causes of Plaintiff's pain condition were the two myelograms performed in the late 1970s and that Plaintiff had been disabled for many years, "certainly prior to 31 March 1988." (R. at 148.)

27.     Plaintiff testified that he was afraid to drive long distances due to his back pain. (R. at 32.) Plaintiff lived on a three acre parcel with his wife, teen-aged son and adult daughter. (R. at 26; 33.) Plaintiff did not participate in social activities, sports, hobbies, housework or yardwork and did not go to the store. (R. at 35.) Plaintiff had a few animals on his place that his son took care of. (*Id.*) Plaintiff testified that he at times needed help with bathing and dressing and that he needed help to put on his socks. (R. at 36.) Plaintiff could sit for a half and hour to forty-five minutes without having to get up. (*Id.*) He could stand for ten minutes without having to move around. (R. at 37.) He estimated that the could walk three city blocks, and could probably lift a gallon or milk. (*Id.*)

28.     Plaintiff testified that he spent several months in Tennessee in 1985 when his father passed away, and was married in Tennessee in 1984. (R. at 40-41.) Plaintiff testified that his son had a calf for a 4-H project and that Plaintiff directed his son how to shred hay and mix it with grain to bring up the weight of the calf. (R. at 42.) Plaintiff testified that he did not shred the hay, but only watched as his son did the work. (*Id.*)

29.     Plaintiff testified that he was in pain everyday after his back surgery. (R. at 54.) He became addicted to Percodan after his surgery, but "kicked the habit" in late 1983. (R. at 55.) Plaintiff's wife also testified that Plaintiff was "hooked on percodans" in 1983. (R. at 68.) Plaintiff and his children received disability insurance benefits until 1998. (R. at 57.) Every year Plaintiff reported how he spent the money that he received for his children as requested by the Social Security Administration. (*Id.*)

**Discussion**

30.     Plaintiff is not challenging the 1983 termination of his disability insurance benefits, but instead appeals the denial of his February 1999 application for disability insurance benefits. Because his disability insured status expired on March 31, 1988, he must show that he was disabled on or before that date. Thus, the issue in this case is not whether Plaintiff is disabled now, but whether he was disabled on or before March 31, 1988. Plaintiff argues that there is no evidence of medical improvement, the ALJ erred in disregarding the opinion of Dr. Marchand, the ALJ erred in relying on evidence of daily activities, the ALJ's finding is inconsistent with the award of supplemental security income, and the ALJ erred in assessing Plaintiff's credibility.

31.     The manner in which Plaintiff's benefits were terminated causes concern. Although Defendant maintains that his disability insurance benefits were terminated in 1983, Plaintiff continued to receive payments until 1998. If Plaintiff had been taken off the benefits in a timely manner, it is much more likely that we would have had good records of Plaintiff's medical condition during the 1980's. Instead, Plaintiff was taken off the benefits, but the actual payments were not stopped until ten years after his disability insured status expired. As a result, Plaintiff has no good medical records from the relevant time period. If Defendant had followed through and stopped the payments in 1983, Plaintiff would have known that he needed to prove his condition before 1988, and it would be much more likely that Plaintiff would have good medical records covering the time in question. Plaintiff was placed at a disadvantage due to Defendant's apparent administrative error and for the Commissioner to now argue that Plaintiff should have better medical records from the 1988 period is disingenuous at best.

32.     Plaintiff asserts that the ALJ's decision is not supported by substantial evidence

because the ALJ failed to establish medical improvement. In benefits termination cases, the ALJ must establish medical improvement. 20 C.F.R. § 404.1579. However, Plaintiff is not arguing that the 1983 termination of benefits should be reopened, but is appealing the denial of his 1999 application for disability insurance benefits. Plaintiff acknowledges as much by stating in his brief that "this is not technically a termination of disability case . . ." (Pl.'s Mot. to Reverse or Remand at 5.) Thus, the ALJ was not required to establish medical improvement.

33.     Plaintiff argues that the ALJ erred in disregarding the opinion of Dr. Marchand. Defendant contends that Dr. Marchand was not a treating physician. Social Security regulations define a treating physician as:

> [A] physician ... who has provided [Plaintiff] with medical treatment or evaluation and who has or has had an ongoing treatment relationship with [Plaintiff].... [A]n ongoing treatment relationship [exists] when the medical evidence establishes that [Plaintiff] see[s] or ha[s] seen the physician ... with a frequency consistent with accepted medical practice for the type of treatment and evaluation required for [Plaintiff's] medical condition(s).

20 C.F.R. § 404.1502.

34.     Dr. Marchand only examined Plaintiff once and did not provide any treatment. (R. at 170-171, 193.) However, the record indicates that Plaintiff's back condition was not amenable to further treatment. The only treatment option offered to Plaintiff after his first laminectomy failed was additional surgery, an option that Plaintiff rejected based on fear of an adverse outcome. (R. at 142.) Indeed, Dr. Marchand believed that Plaintiff's condition was not surgically correctable, but that the pain was probably related to the radiographic dye from the two myelograms. (R. at 146-147.) Because the nature of Plaintiff's condition was not amenable to treatment, and Dr. Marchand did not recommend further treatment, additional treatment was not required for Plaintiff's medical condition.

*See* 20 C.F.R. § 404.1502. Under these circumstances, Dr. Marchand treatment relationship with Plaintiff was consistent with accepted medical practice for the type of treatment required for Plaintiff's medical condition. Accordingly, Dr. Marchand will be deemed a treating physician.

35.    A treating physician may offer an opinion which reflects a judgment about the nature and the severity of a claimant's impairments. *See Castellano v. Sec'y of Health and Human Servs.*, 26 F. 3d 1027, 1029 (10th Cir. 1994). The ALJ must give controlling weight to this type of opinion if it is well supported by clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in the record. *See id.* However, a treating physician's opinion is not dispositive on the issue of disability because final responsibility for determining the ultimate issue of disability rests with the Commissioner. *Id.*

36.    Dr. Marchand throughly examined Plaintiff, took a detailed history, and compared Plaintiff's symptoms with a recent CT scan. (R. at 146-147.) Dr. Marchand observed that Plaintiff needed to change position several times during the interview, had adapted to his chronic back pain by altering his lifestyle, and had self-treated his pain condition with hot baths, and herbal remedies, while avoiding the long-term use of prescription medication. (R. at 146.) Dr. Marchand's documentation of Plaintiff's avoidance of prescription medication is consistent with Plaintiff's and Plaintiff's wife's testimony that Plaintiff overcame an addiction to Percodan in 1983. (R. at 55; 68; 146.) Physical examination revealed scoliosis concave to the right in the lumbar area, tenderness bilaterally in the paraspinous area. (*Id.*) Dr. Marchand observed that straight leg raising and knee chest maneuver caused low back pain and that range of motion was markedly restricted. (*Id.*) The CT scan showed evidence of the prior surgery and degenerative disc disease at L4-L5 and L5-S1, abnormal tissue at L4-L5 possibly compromised the canal and nerve root. (*Id.*) Dr. Marchand

determined that the CT scan readings were consistent with Plaintiff's symptoms. (*Id.*) Thus, Dr. Marchand's opinion is consistent with the objective medical evidence.

37. Dr. Marchand opined that Plaintiff's condition was not surgically correctable, but that the pain was probably related to the radiographic dye from the two myelograms. (R. at 146-147.) Dr. Marchand stated that the radiographic dye was known to cause an inflammatory reaction in the nerves and determined that Plaintiff's symptoms were typical of that phenomenon. (R. at 147.) Dr. Marchand opined that Plaintiff was totally and permanently disabled. (*Id.*) On August 28, 1999, Dr. Marchand wrote that the most likely causes of Plaintiff's pain condition were the two myelograms performed in the late 1970s and that Plaintiff had been disabled for many years, "certainly prior to 31 March 1988." (R. at 148.)

38. In assessing proper weight to accord the opinion of a treating physician the ALJ must evaluate, *inter alia*, the degree to which the physician's opinion is supported by relevant evidence, the consistency between the opinion and the record as a whole, and other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See Goatcher v. Shalala*, 52 F. 3d 288, 290 (10th Cir. 1995). In this case, the ALJ disregarded Dr. Marchand opinion because he believed that it was internally inconsistent and also brief, conclusory and unsupported by the medical evidence. (R. at 14.)

39. The purported internal inconsistency cited by the ALJ was based on Dr. Marchand's statement that he could make no definitive statements concerning Plaintiff's condition prior to the date of his examination and Dr. Marchand's expressed belief that the condition was caused by the two myelograms. (R. at 14.) A review of Dr. Marchand's statement establishes that it is not inconsistent. Although Dr. Marchand was unable to definitively state the cause of Plaintiff's condition, Dr.

Marchand attributed the condition to the radiographic dye used in the myelograms. Since it is undisputed that both myelograms were taken well before 1988, Dr. Marchand was able to state definitively that Plaintiff's condition existed before 1988. Dr. Marchand's opinion is not brief, conclusory or inconsistent with the record. In fact, Dr. Marchand's opinion is consistent with the opinions of Dr. Mora and Singer and is well-supported by the objective CT scan. The ALJ erred in disregarding the opinion of Dr. Marchand. On remand, the ALJ should give proper weight to the opinion of Dr. Marchand.

40.    If any opinion was inconsistent, it was the opinion of Dr. Smithpeter contained in the two Physical Residual Functional Capacity Assessment forms; one for Plaintiff's disability benefits application, (R. at 172-179), and one for Plaintiff's application for supplemental security income. (R. at 180-187.) In the supplemental security evaluation, but not in his disability insurance benefits evaluation, Dr. Smithpeter found it significant that Dr. Marchand had found that Plaintiff's pain problem was related to the radiological dye that he was exposed to twice, that the dye was known to cause such symptoms, that Plaintiff's symptoms were fairly typical of the phenomenon, and that the condition was not surgically correctable. (R. at 182.) Inexplicably, Dr. Smithpeter did not mention the radiographic dye connection in his Physical Residual Functional Capacity Assessment for Plaintiff's disability insurance. The radiographic dye was administered well before 1988. If the dye was significant for the supplemental security income application, it was significant for the disability insurance application. If it was not, the inconsistency should have been explained.

41.    Two other aspects of the ALJ's RFC determination are troubling. The ALJ stated that Dr. Marchand did not take into account that Plaintiff "apparently underwent medical improvement in 1983" but does not cite to any medical records supporting this assertion. (R. at 15.) The ALJ's

statement regarding medical improvement is unsupported by the record. Furthermore, the ALJ relied on the Physical Residual Functional Capacity Assessment dated April 22, 1999 by Dr. Smithpeter. (*Id.*) Dr. Smithpeter never examined Plaintiff and his assessment is based on subjective considerations, *i.e.*, "it is felt" that Plaintiff could do light work duties. (R. at 173-174.) On remand, the ALJ should affirmatively link his RFC determination to objective medical evidence of record, and should not based his decision on the subjective feelings of non-examining agency evaluators.

42.     Plaintiff argues that the ALJ erred in relying on evidence of his daily activities. The ALJ found it significant enough to mention that Plaintiff had married, had a child, alternated his place of residence between New Mexico and Tennessee, put his pain out of his mind and was "able to shred hay for cattle feeding." (R. at 15.) Aside from the hay shredding, none of these activities have any bearing on Plaintiff's RFC. Thus, these factors were irrelevant to the issues at hand and were not a proper topic for consideration.

43.     With respect to the hay shredding, the record contains a notation from Mr. Bill Atkinson dated November 20, 1997 that Plaintiff's allergies "were aggravated when he shredded hay for his calves." (R. at 161.) Plaintiff testified that his son shredded the hay while Plaintiff watched. (R. 42.) Even if the ALJ chose to totally disregard Plaintiff's reasonable explanation, the record contains no other indication of how much hay Plaintiff shredded for how many calves, how often he participated in this activity, or whether he had any assistance from others. The ALJ may consider anecdotal evidence, along with the medical evidence, to determine whether a claimant is disabled. *Talbot v. Heckler*, 814 F. 2d 1456, 1462 (10th Cir. 1987). However, "[t]he `sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity.'" *Thompson v. Sullivan*, 987 F. 2d 1482, 1490 (10th Cir. 1993)(*quoting Frey v.*

*Bowen*, 816 F. 2d 508, 516 ( 10th Cir. 1987)).  On remand, the ALJ may consider Plaintiff's daily activities in conjunction with the entire record, but should not base his RFC determination solely on anecdotal evidence gleaned from isolated references in the record.

44.　　Plaintiff maintains that the ALJ's finding that he is not entitled to disability insurance benefits is inconsistent with the award of supplemental security income.  Plaintiff testified that he was approved for supplemental security income in June or July 1999, but only receives it during part of the year because his wife makes too much money.  (R. at 51.)  The fact that Plaintiff was approved for supplemental security income does not assure that he qualifies for disability insurance benefits. As more fully discussed *supra*, the relevant date for Plaintiff's disability insurance benefits is March 31, 1988, the date his disability insured status expired.  Plaintiff must establish that he was disabled before that date to qualify for disability insurance benefits.  The relevant date for supplemental security income is February 1999, the date Plaintiff applied for supplemental security income.  While Plaintiff was found disabled as of February 1999, he may not have been disabled as of March 1988. Plaintiff's award of supplemental security income is not necessarily inconsistent with the denial of disability insurance benefits.  However, as more fully discussed *supra*, if Dr. Smithpeter's disability insurance evaluation had been consistent with his supplemental security income evaluation, Dr. Smithpeter would have opined that Plaintiff's disabling condition arose well before 1988.

45.　　Plaintiff asserts that the ALJ erred in assessing his credibility.  Because Plaintiff suffers from a pain-producing impairment, the ALJ was required to consider his complaints of pain by evaluating his use of pain medication, his attempts to obtain relief, the frequency of his medical contacts, and the nature of his daily activities, as well as subjective measures of credibility including the consistency or compatibility of non-medical testimony with the objective medical evidence. *See*

*Kepler v. Chater*, 68 F. 3d 387, 391 (10th Cir. 1995).  The ALJ failed to consider all the *Kepler* factors in assessing Plaintiff's credibility.  On remand, the ALJ should follow *Kepler* when re-evaluating Plaintiff's credibility.

### RECOMMENDED  DISPOSITION

I recommend that Plaintiff's Motion to Reverse or Remand (Doc. 6), filed May 20, 2002, be **GRANTED IN PART** and that this matter be **REMANDED** to the Commissioner for the ALJ to give proper weight to the opinion of Dr. Marchand, to explain the inconsistency in the opinion of Dr. Smithpeter, to affirmatively link the RFC determination to objective medical evidence of record, to properly consider Plaintiff's daily activities in light of the entire record, and to re-evaluate Plaintiff's credibility.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C).  Within ten days after a party is served with a copy of these proposed findings and recommendations that party may  file with the Clerk of the District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102, written objections to such proposed findings and recommendations.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**

18